## AFFIDAVIT OF JASON K. BURD

I, Jason K. Burd, being sworn, state:

## INTRODUCTION

1.       I am a Police Officer with the City of Lowell Police Department.  I have been a Lowell Police Officer for the past eleven years.  I have attained a Bachelor's Degree in Criminal Justice from the University of Massachusetts Lowell.  I am currently assigned as a Detective to the Drug Enforcement Administration Cross Border Initiative ("DEA/CBI") as a Task Force Officer ("TFO"), and have been so employed since March 2018. Prior to being assigned to the DEA, I worked as a detective assigned to the Lowell Police Department Special Investigation Section ("SIS") for four years. I have previously been assigned to the Community Response Unit, also known as the Gang Unit, where my duties included gathering gang intelligence and conducting gang investigations. During my career as a Lowell Police Officer, I have also been assigned as a patrolman throughout various areas in the City of Lowell.  I am also a certified Field Training Officer ("FTO") and have trained multiple officers as new hires with the Lowell Police Department.

2.        I have received training in the investigation of controlled substances from the Massachusetts Criminal Justice Training Council and completed the DEA Basic Narcotics School.  I have completed the Proactive Criminal Enforcement Seminar and Advanced Tactics for Criminal Patrol. I have received specialized training in criminal interdiction, hidden electronic and hydraulic compartments, and search and seizure law.  I have also attended the following professional classes through New England High Intensity Drug Trafficking Area: Successful Gang Investigations, Drug Investigations, Street Gangs, Encountering the Drug Trafficker, Pharmaceutical Drug Investigations, Domestic Drug Interdiction and Undercover

Survival Techniques.  I have received additional specialized professional trainings regarding the recruitment, control, and use of confidential sources and hand-to-hand street level drug transactions. I have also received specialized training regarding the preparation and application of search warrant affidavits and have been the affiant of multiple search warrants.  I have been involved in numerous drug arrests and investigations of drug trafficking organizations. These investigations involved but were not limited to the following controlled substances: heroin, fentanyl, cocaine, marijuana, and prescription opiates. During these drug investigations, I have observed hand-to-hand drug transactions, observed numerous controlled substances, and am familiar with the ways illicit substances are packaged for distribution. I have also received annual narcotic training at the Lowell Police Department in-service program.

3.     In the course of my official duties as a police officer and TFO, I have interviewed many defendants, informants, and suspects who were users, sellers and distributors of controlled substances.  On the basis of my training and experience, I am familiar with the vernacular used by illegal drug users and distributors.  I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

4.     As a DEA TFO, I am authorized to investigate violations of the laws of the United States, including violations of the federal drug laws in Title 21 of the United States Code.  I am a "federal law enforcement officer" as defined by Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

**PURPOSE OF AFFIDAVIT**

5.     I am submitting this affidavit in support of:

    a.     An application for a criminal complaint charging Rafael CINTRON, also known as Skinny, with conspiracy to distribute and possess with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1);

    b.     An application for a criminal complaint charging Yunior De La Cruz ZAPATA with conspiracy to distribute and possess with intent to distribute fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and

    c.     An application for the issuance of a search warrant authorizing the search of 8 Grace Terrace, Apartment #3, Lawrence, Massachusetts 01841 ("Target Location"). A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

6.     As will be explained more fully below, between July 26, 2018 and September 13, 2018, CINTRON and ZAPATA conspired to sell and sold suspected fentanyl to an undercover police officer on several occasions near the Target Location.  As part of this investigation, investigators previously obtained search warrants to identify the location of the mobile phone assigned call number (857) 272-2458 ("TT1") used by CINTRON.

7.     As a result and as will be discussed below, I submit that there is probable cause to believe that the locations to be searched contain records and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as

set forth in Attachment B, will be located at the property to be searched, as described in Attachment A.

8.      I have personally participated in the investigation of CINTRON and ZAPATA since July 2018.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

9.      Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that CINTRON and ZAPATA have conspired to distribute fentanyl in violation of 21 U.S.C. §§ 846 and 841(a)(1) and that evidence of criminal activity involving the Target Offenses is located at the property to be searched, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint and search warrant.  Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint or warrant.  Nor do I request that this Court rely on any facts not set forth herein in reviewing these applications.

## **PROBABLE CAUSE**

### Controlled purchase of 50 grams of suspected fentanyl on July 26, 2018

10.      Sometime in July 2018, investigators learned of a fentanyl distributor known only as "Skinny." Investigators received information that Skinny was distributing fentanyl in the Lawrence area and could be contacted at TT1. Investigators also received a description of Skinny as a Hispanic male, 25-30 years old, approximately 5 feet 11 inches, 175 pounds, with a slight

beard. Skinny was later identified as Rafael CINTRON, which is discussed further below in paragraph 20.

11.     On July 26, 2018, an undercover officer (the "UC") sent a text message to TT1 and ordered 50 grams of fentanyl at a price of $1,250. The UC was directed by the operator of TT1 to meet at 241 Howard Street in Lawrence. Prior to departing to 241 Howard Street, the UC was equipped with $1,250 in official agency funds and an audio and video surveillance and recording device.

12.     At approximately 4:39 p.m., the UC arrived at 241 Howard Street in an undercover vehicle. Around the same time, other investigators established surveillance in the area of 241 Howard Street. At approximately 4:41 p.m., surveillance units observed CINTRON leave on foot from the front of the Target Location. The Target Location is within a multi-unit apartment building situated at the end of Grace Terrace, a narrow, dead-end street. At approximately 4:42 p.m., CINTRON approached the undercover vehicle and entered the front passenger seat. Once inside the undercover vehicle, CINTRON handed the UC a plastic bag containing approximately 50 grams of tan and white powder. Based upon my training and experience, the pricing, and the packaging of the powder, I believe that the substance is fentanyl. The UC secured the suspected fentanyl and then handed CINTRON the $1,250 in official agency funds. CINTRON then departed the undercover vehicle. After the transaction, surveillance units observed CINTRON return to the building of the Target Location and enter the building from the left side. The UC then proceeded to a pre-determined meeting location where he relinquished control of the suspected fentanyl to other investigators. The suspected fentanyl was secured and transported to the DEA Northeast Regional Laboratory where analysis is pending. Due to the airborne hazards of fentanyl, the suspected fentanyl was not field tested.

Controlled purchase of 50 grams of suspected fentanyl on September 13, 2018

13.     On September 10, 2018, the UC sent a text message to TT1 and ordered 5 fingers, meaning 50 grams, of fentanyl for a transaction on September 13, 2018. The UC was directed by the operator of TT1 to meet at "23 Woodlant St," which the UC understood to mean 23 Woodland Street in Lawrence. Prior to departing for the meeting location, the UC was equipped with $1,250 in official agency funds and an audio and video surveillance and recording device.

14.     Prior to the planned controlled purchase, other investigators established surveillance in the area of Grace Terrace and Woodland Street in Lawrence. At approximately 2:59 p.m., the UC arrived at 23 Woodland Street. At approximately 3:00 p.m., the UC received an unrecorded phone call from TT1 and spoke to CINTRON, who directed him to drive a short distance and pull over on the side of the road. The UC drove a short distance and stopped at the intersection of Woodland Street and Grace Terrace. Surveillance units and the UC then observed a Hispanic male approximately 5 feet 9 inches, 160 pounds, wearing a gray hooded sweatshirt with black sleeves, black sweatpants, and black Adidas flip flops approach from Grace Terrace and enter the UC vehicle parked on Woodland Street. This male was later identified as Yunior De La Cruz ZAPATA as discussed below. ZAPATA instructed the UC to drive further down Woodland Street. After driving approximately 50 yards, the UC again pulled over to the side of the road. After stopping, the UC handed ZAPATA the $1,250 of recorded funds. ZAPATA then made a brief phone call in Spanish to an unknown person. After the phone call, ZAPATA removed a plastic sandwich bag from the front pocket of his sweatshirt and handed the bag to the UC. The UC observed that the plastic bag contained 5 individually plastic wrapped bags of tan and white compressed powder. Based upon my training and experience, the pricing, and the packaging of the powder, I believe that the substance is fentanyl. ZAPATA then departed the

undercover vehicle. Moments later, surveillance units observed ZAPATA and CINTRON sitting

on the steps of 34 Woodland Street. Approximately one minute later, surveillance units lost sight

of ZAPATA and CINTRON. Thereafter, the UC then proceeded to a pre-determined meeting

location where he relinquished control of the suspected fentanyl to other investigators. The

suspected fentanyl was secured and transported to the DEA Northeast Regional Laboratory

where analysis is pending. Due to the airborne hazards of fentanyl, the suspected fentanyl was

not field tested.

15.     At approximately 4:02 p.m., a surveillance unit observed ZAPATA walking from

Grace Terrace onto Woodland Street. On Woodland Street, ZAPATA had a brief interaction with

a female in the street. The female later entered into a white Honda Accord bearing a New

Hampshire registration and departed the area. The surveillance unit then observed ZAPATA

walk on Grace Terrace towards the Target Location.

16.     At approximately 4:12 p.m., a surveillance unit observed an orange taxi enter

Grace Terrace. Moments later, ZAPATA and CINTRON entered the taxi and departed the area.

After traveling a short distance, the taxi stopped at 41 Woodland Street and a Hispanic male

entered the front passenger seat of the taxi. Surveillance units observed ZAPATA and

CINTRON in the rear passenger seats. At approximately 4:16 p.m., surveillance units stopped

the taxi on East Haverhill Street in Lawrence. During the vehicle stop, ZAPATA provided

investigators a photo identification from the Dominican Republic. ZAPATA was wearing the

same clothing as wore during the controlled purchase with the UC. CINTRON provided

investigators a Massachusetts driver's license. Investigators photographed all identification

documents received from the occupants of the taxi and released all parties. At approximately

4:19 p.m., surveillance was terminated.

<u>Precise Location Information of TT1</u>

17.     On August 31, 2018, investigators sought and obtained search warrants to identify the location information of TT1.

18.     On September 26, 2018, an investigator utilized location information received from AT&T Wireless in conjunction with a cell-site simulator to locate TT1 in the building of the Target Location.

<u>Information received from CS2 corroborating the Target Location</u>

19.     On September 13, 2018, DEA investigators interviewed a Lawrence Police Department confidential informant ("CI") regarding fentanyl sales originating from TT1. The CI has a pending drug case in state court and is cooperating with law enforcement for consideration in his/her pending criminal case. Information received from the CI has been independently corroborated to the extent possible and believed to be reliable. The CI stated that approximately one year ago, he/she was at a market on Howard Street in Lawrence, a short distance from the Target Location. The CI stated that a skinny, dark-skinned, Hispanic male known to the CI as "Rafael Torres" and "Profe" gave the CI a free sample of fentanyl. The CI stated that Torres stated that it was "fire." The CI stated that the sample of fentanyl was double bagged and inside one of the bags was a piece of paper with the phone number for TT1 written on it.

20.     The CI stated that he/she had purchased fentanyl from Torres for approximately one year since September 13, 2018 and that Torres lives in the basement apartment of 8 Grace Terrace, Lawrence, Massachusetts (the Target Location). The CI described the apartment as the basement apartment in the rear of the building, accessible through an entrance behind the building close to the dumpsters. The CI stated that after accessing the rear door to the building, the Target Location is the first apartment on the left from the stairs. The CI stated that Torres

lives in the apartment with his girlfriend, Rosalee (phonetic). The CI stated that he/she has been inside the Target Location to purchase drugs in the past. The CI further stated that Torres often utilizes a grey Nissan Murano. The CI stated that Torres's Facebook account is under the name Rafael Torres. A public Facebook query revealed the account for Rafael Jose Torres. The pictures in this Facebook profile depict Rafael CINTRON and match his photograph from the Registry of Motor Vehicles.

21.     National grid utilities report that Rosalyne Frost, also known as Rosalyn Santos as discussed below, is the utility subscriber at the Target Location. Further, Rosalyn Santos is the registered owner of a grey 2006 Nissan Murano bearing Massachusetts registration 6VNM50. Investigators have seen this vehicle parked outside the Target Location during this investigation. Furthermore, the Registry of Motor Vehicles database shows that Santos has previously used the name Rosalyne Frost.

<u>CINTRON observed at the Target Location</u>

22.     On October 2, 2018, an investigator was conducting surveillance of the Target Location. The investigator entered the building of the Target Location and observed CINTRON look out a window appearing to be from the Target Location. After the investigator entered the building, he confirmed that CINTRON was looking out the window of the Target Location.

**<u>Drug Traffickers' Use of Residences and Cell Phones Generally</u>**

23.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

a.   Controlled substances.

b.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.  Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e.  Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f.  Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g.  Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

i.  Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

10

j.  Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

24.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

25.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

26.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common

practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

27.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

28.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

29.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

30.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

31.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences.

Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

32.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

33.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators,

and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.  Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

34.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals.  Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

35.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

36.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachment B, will be found in the Target Location, described in Attachment A.

## CONCLUSION

37.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that beginning no later than July 26, 2018 continuing until on or about September 13, 2018, Rafael CINTRON and Yunior De La Cruz ZAPATA conspired to distribute fentanyl, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Accordingly, I respectfully request that a criminal complaint charging Rafael CINTRON, also known as Skinny, and Yunior De La Cruz ZAPATA with violations of 21 U.S.C. §§ 846 and 841(a)(1) be issued.

38.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I further submit that there is probable cause to believe that at the Target Location, as described in Attachment A, there exist evidence, fruits, and instrumentalities of CINTRON and ZAPATA's drug distribution activities as set forth in Attachment B.  Accordingly, I respectfully request that a search warrant be issued for the search of the property described in Attachment A for the items detailed in Attachment B.

39.     Disclosure of the contents of the applications, affidavit, complaint, and search warrant could compromise and jeopardize the ongoing investigation.  For that reason, I request that the applications, affidavit, complaint, and search warrant be sealed until further order of the Court.

_____
JASON K. BURD
Task Force Officer
Drug Enforcement Administration


SIGNED and SWORN to before me this day, October 3, 2018.

_____
HONORABLE DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts

## <u>ATTACHMENT A</u>

**(Location to be searched)**

**8 GRACE TERRACE, APARTMENT #3, LAWRENCE, MASSACHUSETTS 01841**

The premises at 8 Grace Terrace, Lawrence, Massachusetts is a multi-unit apartment building.  It has a brick exterior with a glass door.  Apartment #3 is located in the basement of the building. The apartment is accessible through the rear door of the building. A photograph of the building is attached.



**ATTACHMENT B**

**(Items to be seized from property)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses"):

1.    Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3.    Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.    Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5.    Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

6.    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences,

such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.    Cellular telephones.